**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EDWARD A. ADAMS,** | : | **Civil No.  4:16-CV-154** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Brann)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **CAROLYN W. COLVIN** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

In this Social Security Appeal we are called upon to address a familiar issue and review the sufficiency of an Administrative Law Judge's (ALJ) assessment of the medical opinion of a treating physician. We are asked to conduct this evaluation in the case of Edward Adams, an individual who suffered from a cascading array of severe impairments, including degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, diabetes, sleep apnea, and obesity.  (Tr. 57.)  We also undertake this review in a factual context in which the ALJ assigned only "limited weight" to this treating source's opinion that Adams was disabled by these impairments, a judgment which the ALJ explained in a fleeting fashion by simply stating that the treating physician's opinion "that the claimant is capable of no work for one year is not supported by the record as a

1

whole and is not consistent with Dr. Galicia's statement that the claimant's diabetes is without mention of complication." (Tr. 62.) While it is not entirely clear from this cursory description what the basis was for the ALJ's decision to largely reject the treating source's opinion, the ALJ's assertions that a finding of disability was "not supported by the record as a whole", and that Adams' "diabetes is without mention of complication" appears to be plainly at odds with much of the factual record. That factual record documents a prolonged history of significant and uncontrolled diabetes on Adams' part, coupled with dramatic spikes in blood sugar readings, and at least one report of a significant diabetes-related complication, neuropathy.

Thus, in the instant case we are presented with an ALJ's decision to reject a treating course opinion which is largely unexplained by the ALJ and a decision whose only articulated rationale is the factually dubious assertion that "claimant's diabetes is without mention of complication." (Tr. 62.) Since the only articulated rationales for rejecting this treating source opinion are factually suspect, and the decision to largely discount the judgment of the treating medical source is otherwise largely unexplained, it is recommended that this case be remanded to the Commissioner for further proceedings.

2

## II.    <u>Statement of Facts and of the Case</u>

Edward Adams was born on July 22, 1966, and was 45 years old at the time of the alleged onset of his disability.  (Tr. 17-18, 163, 168.)  As such, Adams was considered a considered a "younger individual" by Social Security regulations.  20 C.F.R. §§ 404.1563, 416.963.  Adams had a high school education, (<u>Id</u>.), and had previously worked as a Laborer and Plumber.  (Tr. 62.)   On October 2, 2012,  Mr. Adams applied for disability benefits under Title II of the Social Security Act, alleging that he had become disabled beginning in August of 2008.   (Tr. 55.) Adams' application was denied at the initial level on December 4, 2012, and Adams requested a hearing before an administrative law judge on January 16, 2014.  (<u>Id</u>.)  That hearing was conducted on June 11, 2014.  (Tr. 13-29.)

In his disability application Adams alleged that he was disabled due to the combined effects of degenerative disc disease of the cervical and lumbar spine; diabetes; obstructive sleep apnea; and obesity. Adams' claim of disability was supported by a medical source statement submitted by his treating physician, Dr. Henderson, on April 10, 2013.  (Tr. 566-570.)  In this statement, Dr. Henderson indicated that Adams' spinal impairments, diabetes, obesity and sleep apnea combined to severely limit his ability to work.  (<u>Id</u>.)  According to Dr. Henderson, Adams could only occasionally lift up to 10 pounds, and could never lift more than

10 pounds due to his impairments. Indeed, the doctor related that carrying as little as a half gallon of milk resulted in spinal pain for Adams. Dr. Henderson also stated that Adams needed hand held devices for ambulation, and could stand or walk for less than 2 hours per day. In addition, the doctor also reported that Adams could sit for less than 2 hours each day, and would need multiple unscheduled breaks due to back pain. (Id.) Dr. Henderson further concluded that Adams was precluded from pushing or pulling, climbing, balancing, stooping, crouching, crawling bending or twisting at work. (Id.) Dr. Henderson also opined that Adams' medical conditions would result in frequent work absences, and that he was incapable of working due to these impairments. (Id.)

Substantial independent medical evidence seemed to support the opinion of Adams' treating physician. This evidence was derived from multiple sources. At the outset, Dr. Henderson's opinions were consistent with Adams' own reported activities of daily living. According to Adams, although he loved his work, his impairments now prevented him from working, and left him largely homebound and dependent upon his mother. (Tr. 21-22.) In fact, Adams described a severely limited personal lifestyle, explaining that he normally awoke at around 8:00-9:00 a.m. and took his mother's dogs outside. After eating breakfast, Adams would go back to bed until about 2:00 in the afternoon. Arising in the afternoon, Adams

4

would attempt to do some light household chores and prepare a meal.  However, he had to sit down while cooking, because he could not tolerate standing for prolonged periods.  Adams estimated that he could walk about ten minutes before he has to sit for thirty minutes to an hour because of severe pressure pain in his low back, which left him feeling unbalanced and nauseous.  (R. 22-4.)  According to Adams, he typically enjoyed only about three or four productive hours a day with activities such as sweeping the floor, wiping down the bathroom, and taking the dogs outside, and then must spend at least four to six hours a day lying down. Adams also acknowledged that this constant pain affected his cognitive clarity, stating that when his pain is too severe, he becomes distracted and "zone[s] out" from conversations around him.  (Tr. 24-25.)

In addition, to Adams' self-reported limitations, other clinical evidence supported Dr. Henderson's findings that Adams suffered from disabling pain and impairment.  For example, multiple x-rays and MRI tests conducted between 2009 and 2013, confirmed the existence of an array of significant spinal impairments, which were rated as mild, moderate and severe.  Thus, these tests results identified that Adams suffered from spinal stenosis, bone spurs, bulging discs, and clinically corroborated the presence of a series of medical sources for Adams' reported chronic incapacitating back pain.  (Tr. 338, 579-84, 620-27.)

Further, a polysomnogram test conducted on November 12, 2012, diagnosed Adams as suffering from severe sleep apnea with severe respiratory-event related sleep hypoxemia, (Tr. 526-27.), and medically records routinely confirmed Adams' obesity documenting weights in excess of 300 pounds, a factor which further complicated Adams' health and impaired his ability to work.

All of these medical conditions, in turn, were exacerbated by Adams' diabetes. Adams had been treated for his diabetes by Dr. Jason Galicia and his staff since October 7, 2011. While some of Dr. Galicia's treatment records contained a cryptic description of Adams' conditions as "diabetes mellitus without mention of complication", (Tr. 603.), the medical records as a whole described a prolonged history of significant and uncontrolled diabetes on Adams' part, coupled with dramatic spikes in blood sugar readings, and at least one report of a significant diabetes-related complication, neuropathy.

Indeed, when Adams first began his diabetic care in October of 2011 it was noted that his diabetes had progressed over the past two years and was complicated by neuropathy, with leg numbness and pain, fatigue and blurred vision. It was also observed that Adams was morbidly obese and not compliant with dietary recommendations. (Tr. 279-281.) Throughout 2012 and 2013, these treatment records consistently documented significant medical complications arising from

6

Adams' uncontrolled diabetes. For example, in late 2012, it was noted that Adams was not checking his glucose levels regularly and admitted to poor self-care. (Tr. 552-555; 585-590.) Adams was later seen in the Emergency Room of the Chambersburg Hospital on July 20, 2013 suffering from diabetes related medical complications. At that time medical records revealed an initial glucose level which was dangerously high, 524. Even under treatment these glucose levels persisted at an alarmingly high level, 304. At the time of this emergency room intervention Adams reported that he had recently been evicted from his home and was living in a hotel room with his mother. (Tr. 618-19.)

These diabetes-related medical complications continued throughout 2014. On February 24, 2014, Dr. Galicia found that Adams' A1C test results, a test which is used to measure blood sugar levels over time, had worsened, but that he was taking was taking his medications regularly and had fair control of his diabetes. He had decreased mobility, however, due to increased back pain. (Tr. 603-607.) While under a doctor's care during this period of alleged disability Adams has undergone a series of blood glucose and A1C tests to monitor his diabetes. These test results have consistently confirmed that Adams' diabetes is a serious medical concern. In fact, since his alleged onset date, Adams' glucose readings have ranged from 341 on November 20, 2012 to 524 on July 20, 2013. A

7

normal range is 70-99.  In turn, Adams' A1C test results have ranged from 14.4% in November 2012 to 8.4% in November 2013.  A normal range for this test is between 4 and 6%.  (Tr. 552-555; 618-619.)

It was against the backdrop of this medical and factual history, a medical history which seemed to largely corroborate Dr. Henderson's opinion that Adams was disabled, that the ALJ assessed Adams' disability claim.  On June 20, 2014, following the hearing conducted in Adams' case, the ALJ issued a decision denying Adams' application for disability benefits.  (Tr. 55-64.)  In this opinion denying benefits to the plaintiff, the ALJ found at Step 1 of the five step sequential process for evaluating disability claims that Adams met the Act's insured requirements.  (Tr. 57.)  At Step 2 the ALJ concluded that Adams suffered from an array of severe medical impairments including degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, diabetes, sleep apnea, and obesity.  (Tr. 57.)  At Steps 3 and 4 of this sequential analysis, the ALJ concluded that none of Adams' impairments met a listing which would define him as *per se* disabled, (Tr. 58-9.), but also found that Adams could not return to his past employment due to these impairments.  (Tr. 62.)  The ALJ then found that Adams retained the residual functional capacity to perform a limited range of sedentary work despite these impairments, and concluded that Adams could

8

perform the sedentary jobs of order clerk, nut sorter, and stuffer.  (Tr. 63.)  Based upon these findings, the ALJ concluded that Adams was not disabled and denied this disability application.  (Id.)

In reaching this conclusion the ALJ necessarily was required to address the treating source opinion of Dr. Henderson that Adams was totally disabled, a treating source opinion which Social Security regulations enjoin ALJs to give great weight and careful consideration when making disability determinations. Notwithstanding the substantial factual support on the record for this opinion, the ALJ disposed of this treating source assessment in a summary manner by simply stating that the treating physician's opinion "that the claimant is capable of no work for one year is not supported by the record as a whole and is not consistent with Dr. Galicia's statement that the claimant's diabetes is without mention of complication." (Tr. 62.)

This appeal followed.  (Doc. 1.)  On appeal, Adams challenges the ALJ's treatment of this medical expert opinion provided by a treating source, and the residual functional capacity assessment which flowed from the ALJ's decision to reject this treating source opinion.  This appeal is fully briefed by the parties, and is therefore, ripe for resolution.  (Docs. 10-12.)

For the reasons set forth below, we find that the treatment and analysis of this treating source opinion is not sufficient to allow us to determine whether the decision denying benefits to Adams is supported by substantial evidence. Therefore, it is recommended that this case be remanded for further consideration and assessment of this treating source medical evidence.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of This Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.

Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether a plaintiff is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B.   <u>Initial Burdens of Proof , Persuasion and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §416.920(a).   Under this process, the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education,

work experience and residual functional capacity ("RFC"). 20 C.F.R. §416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §416.912; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age,

education, work experience and RFC.  20 C.F.R. §416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.  Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."  <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Id</u>. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

## C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence</u>

Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."

14

<u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000).

The Commissioner's regulations, however, guide ALJs and the Court in the assessment of this type of medical opinion evidence. Those regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions. 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and, therefore,

15

their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record). Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which

emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this Court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently, we aptly summarized the controlling legal benchmarks in this area in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001)(citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).   Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986).  The regulations also address the weight to be given a treating source's opinion:  "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 CFR § 404.1527(c)(2).  "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time."  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of

contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317 .

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion, and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Indeed, this principle applies

18

with particular force to the opinion of a treating physician.   See 20 C.F.R. §404.1527(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").   "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'"   Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).   Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

### D.   A Remand is Necessary Here to Further Assess the Medical Evidence

Judged against these legal guideposts, it is submitted that a remand is appropriate here to allow for further consideration of the treating source medical evidence.  That treating source evidence, provided in an April 2013 medical source statement from Adams' treating physician, Dr. Henderson, documented that Adams suffered from a battery of disabling medical conditions.   Thus, Dr. Henderson indicated that Adams' spinal impairments, diabetes, obesity and sleep apnea combined to preclude him from performing work.  (Tr. 566-70.)  According to Dr. Henderson, Adams could only occasionally lift up to 10 pounds, and could never lift more than 10 pounds due to his impairments.  Indeed, the doctor related

that carrying as little as a half-gallon of milk resulted in spinal pain for Adams. Dr. Henderson also observed that Adams needed hand held devices for ambulation; could stand or walk for less than 2 hours per day; could sit for less than 2 hours each day; and would need multiple unscheduled breaks due to back pain.  (Id.)

These medical findings, in turn, were confirmed and corroborated in multiple ways by the evidence that was before the ALJ.  For example, Adams' self-reported activities disclosed that he typically enjoyed only about three or four productive hours each day, and then must spend at least four to six hours a day lying down.  Adams also acknowledged that this constant pain affects his cognitive clarity, stating that when his pain is too severe, he becomes distracted and "zone[s] out" from conversations around him.  (Tr. 24-25.)

Objective clinical evidence, which include multiple x-rays and MRI tests conducted between 2009 and 2013, further corroborated that Adams experienced an array of significant spinal impairments, which were rated as mild, moderate and severe.  Thus, these tests results identified that Adams suffered from spinal stenosis, bone spurs, bulging discs, and clinically corroborated the presence of a series of medical sources for Adams' reported chronic back pain.  (Tr. 338, 579-84, 620-27.)

Despite this body of evidence supporting Dr. Henderson's conclusions, the ALJ rejected this treating source opinion in a cursory fashion, stating that the treating physician's opinion "that the claimant is capable of no work for one year is not supported by the record as a whole and is not consistent with Dr. Galicia's statement that the claimant's diabetes is without mention of complication." (Tr. 62.)  Yet, neither of these proffered justifications for discounting this treating medical source can withstand careful scrutiny.  At the outset, the ALJ's assertion that these treating source findings are "not supported by the record as a whole" ignores the multiple clinical test results and Adams' self-reported activities, both of which confirm that Adams was experiencing severe medical complications due to the combined effects of spinal impairments, diabetes, sleep apnea and obesity. Since "an ALJ may not make 'speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion.'  Morales v. Apfel, supra at 317," Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016), this cryptic assertion that Dr. Henderson's opinion is not supported by the record as a whole—an assertion which actually seems to be contradicted by much of the medical record—does not

21

justify discounting the treating source opinion in this case without some further, and more detailed, analysis.

Likewise, the ALJ's decision to reject the treating source opinion because it allegedly "is not consistent with Dr. Galicia's statement that the claimant's diabetes is without mention of complication," fails on close examination. While admittedly some of Dr. Galicia's treatment records contained a cryptic description of Adams' conditions as "diabetes mellitus without mention of complication", (Tr. 603.), when Dr. Galicia's treatment records are examined as a whole they describe a prolonged history of significant and uncontrolled diabetes on Adams' part, coupled with dramatic spikes in blood sugar readings, and at least one report of a significant diabetes-related complication, neuropathy. Indeed, when Adams first began his diabetic care in October of 2011 it was noted that his diabetes had progressed over the past two years and was complicated by neuropathy, with leg numbness and pain, fatigue and blurred vision. It was also observed that Adams was morbidly obese and not compliant with dietary recommendations. (Tr. 279-281.) Throughout 2012 and 2013, these treatment records consistently documented significant medical complications arising from Adams' uncontrolled diabetes. For example, in late 2012, it was noted that Adams was not checking his glucose levels regularly and admitted to poor self-care. (Tr. 552-555; 585-590.)

22

Adams was later seen in the Emergency Room of the Chambersburg Hospital on July 20, 2013, and treated for a diabetes related medical emergency. At that time Adams' an initial glucose level which was dangerously high, 524, and only later did this blood sugar level decline to an alarmingly high level, 304. Further, while under Dr. Galicia's care during this period of alleged disability Adams has undergone a series of blood glucose and A1C tests to monitor his diabetes. These test results have consistently confirmed that Adams' diabetes is a serious medical concern. In fact, since his alleged onset date, his glucose readings have ranged from 341 on November 20, 2012, to 524 on July 20, 2013. A normal range is 70-99. Adams' A1C test results have ranged from 14.4% in November 2012 to 8.4% in November 2013. A normal range for this test is between 4 and 6%.(Tr. 552-555; 618-619.)

Taken together these treatment records appear to confirm, rather than contradict, Dr. Henderson's opinion regarding the severity of Adams' medical conditions. In fact, the records describe a prolonged history of significant and uncontrolled diabetes on Adams' part, dramatic spikes in blood sugar readings, and significant diabetes-related medical complications. Therefore, Dr. Galicia's treatment records may not be relied upon to discount this treating source opinion based solely upon a summary labeling of this diabetes treatment history as

23

"without mention of complication."   Given the gravity of his condition, as disclosed in these records, some further analysis is essential before it can be said that the diabetes treatment history rebuts the treating doctor's conclusion that Adams is disabled.

Yet, while case law calls for a remand and further proceedings by the ALJ in this case assessing this claim, nothing in our opinion should be construed as suggesting what the outcome of that final and full analysis should be.   Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ.   Therefore, nothing in this Report and Recommendation should be deemed as expressing an opinion on what the ultimate outcome of any reassessment of this evidence should be.   Rather, that task should remain the duty and province of the ALJ on remand.

## IV.   <u>Recommendation</u>

Accordingly, because we find that the ALJ's decision is not supported by substantial evidence, IT IS RECOMMENDED that the plaintiff's request for a new administrative hearing should be GRANTED, the final decision of the Commissioner denying this claim should be vacated, and this case should be remanded to the Commissioner to conduct a new administrative hearing pursuant to 42 U.S.C. §405(g).   IT IS FURTHER RECOMMENDED that final judgment

should be entered in favor of the plaintiff and against the Commissioner of Social

Security.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and

Recommendation may constitute a waiver of any appellate rights.

Submitted this 24th day of February, 2017.


 _s/Martin C. Carlson_____
Martin C. Carlson
United States Magistrate Judge